UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LINDA K. LACY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:12-CV-16 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 31, 2009, plaintiff Linda Lacy filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January 15, 2003. (Tr. 89). Later, plaintiff amended the onset date to March 31, 2009. (Tr. 114). After plaintiff's application was denied on initial consideration (Tr. 46), she requested a hearing from an Administrative Law Judge (ALJ). See Tr. 53-54 (acknowledging request for hearing).

Plaintiff and counsel appeared for a hearing on February 26, 2010. (Tr. 18). The ALJ issued a decision denying plaintiff's application on July 6, 2010 (Tr. 9-17), and the Appeals Council denied plaintiff's request for review on November 2, 2011. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 115-127), plaintiff listed her disabling conditions as diabetes, hypertension, loss of vision in both eyes, pain in both legs and arms, and depression.  She stated that she has difficulty sitting longer than a few minutes at a time because of leg pain, and that her vision is deteriorating from diabetes.  Plaintiff listed her past employment as a waitress at a restaurant, a snack vendor at a ball park, and a hotel housekeeping maid.  She wrote that she was unemployed and had not worked since 2005 because her poor vision prevents her from walking around.  Plaintiff reported taking the following medications: Caduet for high cholesterol, Lisinopril and Toprol XL for high blood pressure, Novolin (insulin) for diabetes, and Ranitidine for acid reflux.

In her Function Report (Tr. 128-138), plaintiff stated that she lived alone in an apartment.  On an average day, she said she sleeps, "lay[s] around," and talks on the phone.  She reported that she has no hobbies, and can only pay attention for ten minutes.  Plaintiff indicated that her personal care and her daily activities had changed due to her hand cramps, and she had difficulty dressing herself, bathing, and grooming.  She stated that she is able to prepare sandwiches, soups, and vegetables for herself on the weekends, but preparing this food takes her a prolonged period of time.  Cleaning takes plaintiff three hours because she must sit down and take breaks.  Plaintiff leaves her apartment three times per week, but cannot go out alone or drive herself because her vision is poor.  She reported being able to walk one block before needing to rest.  She shops for food and cleaning supplies approximately once every month, but reported difficulty paying bills.  Plaintiff indicated that she struggles to follow written instructions, but is able to follow oral instructions.  She said she has difficulty handling stress or changes in routine.

## B. Hearing on February 26, 2010

Plaintiff was 44 years old at the time of the hearing, and lived alone in an apartment. She attended school through the eleventh grade. According to plaintiff's testimony, her poor eyesight, deteriorating from diabetes, prevents her from working. Plaintiff explained that she was diagnosed with diabetes about 20 years earlier. She admitted that she had stopped taking her diabetes medication because she was depressed after the deaths of several family members. She insisted that she takes her blood pressure medication regularly, but in combination with her other medications, it makes her feel tired and "drunk." Plaintiff had laser surgery on her left eye for microaneurysms, and she indicated that she is completely blind in her right eye. (Tr. 22-26).

Plaintiff testified that she does not have the strength to do anything all day because of her depression. Plaintiff stated that she experiences pain in her legs, the cause of which is unknown as no doctor ever sent her to have her legs examined. She reported that she is able to walk or stand for 30 minutes before needing to rest, and that sitting made her legs hurt as well. She said that she could lift 15 pounds before experiencing arm pain similar to her leg pain. Plaintiff testified that she quit smoking, but subsequently recanted, admitting that she smokes about five cigarettes per day. She also testified that she quit drinking. (Tr. 27-31).

Plaintiff eats microwaved foods because her poor vision prevents her from using the stove. Her sister does her laundry, and helps her with other household chores. Plaintiff reported that she can dress and bathe herself adequately. She stated that her sister pays for everything, including medicine. When asked to explain her total reported income over her entire life (just over $11,000) she said she could not

remember what she did during years she reported no income at all, or if she received welfare during those years. (Tr. 27- 32).

Finally, plaintiff described an incident in the 1990s when a man for whom she was babysitting raped and murdered a teenager. She stated that she thinks about that episode all the time, and how she might have been the victim instead. Plaintiff indicated that she does not get along with others, because she has no teeth and feels ugly. She avoids going outside because she is so self-conscious about her missing teeth. (Tr. 32-6).

Jeffrey McGraski, a vocational expert, provided testimony regarding employment opportunities for a hypothetical individual with plaintiff's education and age, with the ability to perform light work requiring simple tasks only, in a temperature controlled environment, without ladders, ropes, scaffolds, unprotected heights, or hazardous machinery, requiring no depth perception, and only occasional contact with the public and co-workers. Mr. McGraski opined that such an individual would be able to work as a bagger (1,000 positions available within the state of Missouri; 50,000 in the national economy) or a packer (1,500 positions available within the state of Missouri; 100,000 in the national economy). In response to a second hypothetical, in which the ALJ added that the individual could occasionally climb stairs and ramps, and frequently but not constantly balance, stoop, kneel, crouch, and crawl, Mr. McGraski testified that this would not impact the number of jobs available. He also stated that no jobs would exist if such an individual required time for unscheduled disruptions due to the effects of medication, would have to lie down and take breaks, and was unable to concentrate for an eight-hour work day. Finally, plaintiff's counsel asked about the jobs available to the person from the first and second hypotheticals, if that person also had light

perception in one eye, and limited vision allowing perception of only gross visual distinctions in the other eye. Mr. McGraski responded that the same jobs mentioned initially would be available according to the Dictionary of Occupational Titles because they only require gross visual ability, although as a vocational expert he did not believe any jobs would exist for a person with those limitations. (Tr. 38-40).

### C. Medical Evidence

On June 15, 2009, plaintiff saw Kenneth L. Wilkins, M.D. for diabetes, hypertension, and hyperlipidemia. Plaintiff's grooming and affect were normal. Plaintiff stated that she had crying spells for no reason, could not find a place to live, and was tired of taking all of her medications. Dr. Wilkins diagnosed plaintiff with depression, and prescribed Paxil. (Tr. 367-69). On September 28, 2009, Dr. Wilkins increased plaintiff's Paxil dosage, noting plaintiff's dysthymic mood and feelings of worthlessness, and referred her to Hopewell Clinic. (Tr. 362). On December 28, 2009, Dr. Wilkins again increased plaintiff's Paxil dosage. (Tr. 359).

On October 13, 2009, plaintiff saw Laila Gabrawy, M.D. for total loss of vision in her right eye and blurred vision in her left eye.[1] Dr. Gabrawy determined plaintiff's visual acuity in her left eye to be 20/200 without a prescription, and 20/25 with her current prescription.[2] Plaintiff's right eye was only capable of light perception ("LP").

---

[1] In the medical records, "right eye" is often called "OD" and "left eye" is called "OS." Krissa Lyse B. Drentlaw, Visual Acuity: The Critical Measure!, Association of Technical Personnel in Ophthalmology, Fig. 1.2 at 4,
http://www.atpo.org/Documents/New/Articles/Visual%20Acuity%20The%20Critical%20Measure!.pdf.

[2] Visual acuity uncorrected by a prescription is indicated by the abbreviation "s.c." while a measurement with correction is indicated by the abbreviation "c.c." Krissa Lyse B. Drentlaw, Visual Acuity: The Critical Measure!, Association of Technical Personnel in Ophthalmology, Fig. 1.2 at 4. Visual acuity is often expressed "as a fraction in which the numerator denotes the distance the patient is from the chart and the denominator denotes the distance at which an emmetropic eye could see the optotype on the chart. For example, a patient with a visual acuity of 20/50 sees at twenty feet what the patient with no refractive error or ocular pathology would see at fifty feet." Id. at 3.

Dr. Gabrawy also observed cataracts in both eyes, retinal abnormality, retinal hemorrhaging, and retinal blood vessels with microaneurysms. Dr. Gabrawy recommended prescription eyeglasses and medical therapy safety glasses, and referred plaintiff to Connect Care for further treatment. (Tr. 360-61).

On October 20, 2009, plaintiff met with Courtney Morgan, M.A., an outpatient therapist at Hopewell Center. Morgan noted that plaintiff's affect appeared blunted, and that plaintiff stood or paced throughout the interview because it was painful to sit down. Morgan concluded that plaintiff suffered from pain disorder with psychological factors, experienced severe problems with daily living, and had a GAF of 41. (Tr. 296-99). On October 29, 2009, plaintiff went to Eye Associates for a retinal evaluation. Plaintiff's left eye demonstrated distance visual acuity of 20/100 without correction, and near visual acuity of 20/25 with correction. Plaintiff's pinhole visual acuity was 20/60.[3] Vision in her right eye was limited to only light perception. (Tr. 392-394). A November 19, 2009 exam revealed left eye visual acuity of 20/200, and pinhole visual acuity of 20/30. (Tr. 396).

On January 5, 2010, an eye examination again found only light perception in plaintiff's right eye, and uncorrected visual acuity of 20/100 in the left. Pinhole visual acuity was 20/60. (Tr. 397). Another eye examination on January 14, 2010 showed visual acuity of 20/400 and pinhole visual acuity of 20/60 in the left eye, and light

---

[3] A pinhole occluder is a device used to distinguish between vision deficiencies resulting from refractive errors which can be corrected with lenses and others deficiencies caused by eye disease which cannot. A pinhole occluder determines the best visual acuity attainable through the use of corrective lenses. See Bill Lloyd, How does squinting improve eyesight?, WEB MD, (Nov. 4, 2008), http://blogs.webmd.com/eye-on-vision/2008/11/how-does-squinting-improve-eyesight.html (last visited October 29, 2012). See also, University of Michigan Kellogg Eye Center, Visual Acuity, THE EYE'S HAVE IT, http://www.kellogg.umich.edu/theeyeshaveit/screening/visual-acuity.html (last visited October 29, 2012).
Pinhole visual acuity is abbreviated on ophthalmologists' charts as "PH." Krissa Lyse B. Drentlaw, Visual Acuity: The Critical Measure!, Association of Technical Personnel in Ophthalmology, Fig. 1.2 at 4.

perception in the right eye. (Tr. 398). Finally, on February 16, 2010, A. Malik, M.D. at Hopewell Center diagnosed plaintiff with bipolar disorder, depression, and posttraumatic stress disorder. Dr. Malik discontinued Paxil and prescribed Remeron and Seroquel. Dr. Malik determined that plaintiff's GAF score was 35. (Tr. 379-82).

### III. The ALJ's Decision

In the decision issued on July 6, 2010, the ALJ made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since March 31, 2009, the application date.

2. Plaintiff has the following severe impairments: insulin dependent diabetes mellitus, depression/bipolar disorder, and decreased visual acuity.

3. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff has the residual functional capacity to perform light work, except she cannot climb ropes, ladders, or scaffolds; must avoid concentrated exposure to industrial hazards and unprotected heights; cannot perform jobs requiring depth perception; must work in a temperature-controlled environment; and is limited to simple tasks only which require no more than occasional contact with the general public and co-workers.

5. Plaintiff has no past relevant work.

6. Plaintiff was born on March 1, 1965 and was 44 years old on the date the application was filed.

7. Plaintiff has a limited education, and is able to communicate in English.

8. Transferability of job skills is not an issue because plaintiff has no past relevant work.

9. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

10. Plaintiff has not been under a disability, as defined in the Social Security Act, since March 31, 2009, the date the application was filed.

(Tr. 11-17).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If

the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After

-9-

considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ failed to properly consider evidence relating to plaintiff's visual acuity and mental health.  The Court will address each of plaintiff's arguments in turn.

**1. Visual Acuity**

Plaintiff contends that the ALJ failed to consider or understand the ophthalmological medical evidence in the record when determining that plaintiff's condition did not meet or equal a listed impairment, or when arriving at plaintiff's RFC. Plaintiff argues that her condition meets the listed impairment of "Loss of Visual Acuity," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02, that her RFC is not supported by substantial evidence, and that the ALJ should have ordered a consultative examination or obtained testimony of a medical advisor to improve the ALJ's understanding of the visual acuity records and the degree of plaintiff's limitations.

### A. Listing 2.02

The ALJ discussed his reasons for finding that plaintiff did not meet a listing under 12.00 Mental Disorders, but he did not explain why plaintiff did not meet the disability listing of 2.02 Loss of Visual Acuity.  However, "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record."  Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).  The issue is whether the ALJ's conclusion is supported, not whether the ALJ explained that support in his decision.

Under listing 2.02, the plaintiff is disabled if the vision in her better eye after best correction is 20/200 or less.  The ALJ's conclusion is clearly supported by the record, which is replete with evidence that plaintiff's vision in her left and better eye after best correction was consistently better than 20/200.  Plaintiff misreads the record and argues that medical evidence shows visual acuity of 20/200 in her left eye *with a prescription*.  In fact, a careful examination of every visual acuity examination undergone by plaintiff reveals left eye visual acuity of 20/100, 20/200, or 20/400

*uncorrected*.[4]  With correction, Dr. Gabrawy found plaintiff's left eye improved to 20/25. (Tr. 360).   Furthermore, every examination conducted with a pinhole occluder found that plaintiff's visual acuity could be corrected to 20/60 or better.[5]  The ALJ's conclusion that plaintiff did not meet the criteria of listing 2.02 is supported by the record, and the ALJ's failure to discuss his reasoning is not reversible error.

### B. Residual Functional Capacity

Plaintiff argues that the ALJ's RFC determination is flawed, because it does not adequately account for plaintiff's visual limitations.  However, the ALJ clearly considered plaintiff's loss of vision in his RFC determination.  The RFC limits plaintiff to tasks that do not require depth perception, accommodating plaintiff's loss of vision in her right eye. (Tr. 12).  Furthermore, the ALJ discussed the visual acuity examination conducted by Dr. Gabrawy. (Tr. 13).  Although this was the only eye examination discussed in the opinion, the ALJ need not mention every piece of evidence submitted.  Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010).  In this case, visual acuity and pinhole visual acuity tests consistently showed plaintiff's vision in her left eye to be correctable to 20/25 (95% visual acuity efficiency), 20/30 (90% efficiency), or 20/60 (70% efficiency).  20 C.F.R. Pt. 404, Subpt. P, App. 1, Tbl. 1.  This evidence shows that plaintiff's vision in her left eye is generally correctable with prescription lenses.  This justifies the ALJ's decision not to include any additional visual limitations in the RFC.

---

[4] Dr. Gabrawy found left eye visual acuity of 20/200 without correction. (Tr. 360). Eye Associates found left eye visual acuity of 20/100 without correction.  (Tr. 392).  Subsequent exams found left eye visual acuity to be 20/200 (Tr. 396), 20/100 (Tr. 397), and 20/400 (Tr. 398) - all *without* correction.

[5] On October 29, 2009, plaintiff's corrected near vision was 20/25 and her pinhole visual acuity was 20/60. (Tr. 392).  On November 19, 2009, plaintiff's pinhole visual acuity was 20/30. (Tr. 396).  On January 5, 2010 and January 14, 2010, plaintiff's pinhole visual acuity was 20/60 (Tr. 397-98).

Finally, even if the ALJ found an RFC exactly corresponding with what plaintiff's counsel suggested in his hypothetical at the hearing, the number of jobs available would not have changed. As the VE testified, the occupations of bagger and packer require only gross visual ability according to the Dictionary of Occupational Titles. (Tr. 38-40).

In conclusion, the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

### C. Lack of Consultative Examination or Medical Advisor

Next, plaintiff argues that the ALJ was confused by the ophthalmological records, and therefore should have ordered a consultative examination or consulted a medical advisor. During the hearing, both the ALJ and the plaintiff's counsel remarked upon the difficulty of deciphering ophthalmological records. (Tr. 25-6).

Under the regulations, if the medical evidence available to the ALJ is insufficient to enable a determination of whether claimant is disabled, a consultative examination may be ordered. 20 C.F.R. § 416.917. Failure to order an examination is reversible error only if the ALJ could not make an informed decision on the record without it. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985) (quoting Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984)) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."). The ALJ may also consult with an independent medical advisor to more fully understand the plaintiff's impairments. Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004).

In this case, failure to order a consultative examination or to utilize an independent medical expert was not error. The multiple examinations in the record were a sufficient basis upon which the ALJ could make an informed decision. The visual acuity scores were clear from the face of these records without additional elaboration from experts.

**B. Mental Health**

Plaintiff claims that the ALJ did not consider the impact of her non-exertional mental impairments on her exertional abilities in determining her RFC, as required by SSR 96-8p (S.S.A.). SOCIAL SECURITY RULING, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184. Furthermore, plaintiff suggests that the ALJ did not properly weigh medical evidence regarding plaintiff's mental health as required by the regulations.

The ALJ found that plaintiff suffers from the severe impairment of depression/bipolar disorder (Tr. 11), and accounted for plaintiff's mental impairments by finding that plaintiff has the residual functional capacity to perform "simple tasks only which require no more than occasional contact with the general public and co-workers." (Tr. 12). In arriving at this conclusion, the ALJ discussed the findings of Dr. Wilkins, Dr. Malik, and Ms. Morgan. The ALJ also discussed the credibility of plaintiff's complaints of depression.

Dr. Wilkins diagnosed plaintiff with depression, and although he met with the plaintiff multiple times, he did not observe any of the severe symptoms that Dr. Malik recorded. The ALJ decided to discount Dr. Malik's medical opinion because Dr. Malik only met with the plaintiff once, just ten days prior to the hearing. (Tr. 14). The length

of the treatment relationship and the frequency of examination are permissible considerations when weighing the opinions of different medical sources. 20 C.F.R. § 404.1527. See also, Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) (citing Loving v. Dep't of Health & Human Serv., 16 F.3d 967, 971 (8th Cir. 1994)) (allowing an ALJ to discount a one-time evaluation).

The ALJ also found plaintiff's complaints of disabling depression not credible. When applying for disability benefits, plaintiff stated she was not seeing anyone for her depression and suggested there was no reason to do so. (Tr. 14). The ALJ noted that plaintiff has a history of medical noncompliance. Id. Noncompliance may be considered in a credibility determination. See, Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Furthermore, the ALJ observed that plaintiff made inconsistent statements to treating sources (Tr. 15). The ALJ also remarked on her lack of work history, which the Eighth Circuit has held "may indicate a lack of motivation to work rather than a lack of ability," and may negatively impact plaintiff's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)). The ALJ was allowed to consider all of the above-mentioned factors in his credibility determination, and that determination was adequately supported.

Finally, plaintiff argues that because the ALJ did not mention the GAF scores of 41 and 35, assigned to the plaintiff by Ms. Morgan and Dr. Malik respectively, the ALJ did not consider them. This is incorrect. The ALJ discussed the evidence from both Ms. Morgan and Dr. Malik, and necessarily considered the GAF score when considering the evidence from those professionals, even if the ALJ failed to explicitly discuss those scores. See Bradley v. Astrue, 528 F.3d 1113, 1115 n.3 (8th Cir. 2008).

In conclusion, the ALJ did not err in weighing the medical and subjective evidence of plaintiff's mental impairment. The ALJ's RFC, which includes an accommodation for plaintiff's mental disabilities, is supported by substantial evidence on the record as a whole.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#19] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of December, 2012.